**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-67-CJN** |
| **JOSHUA JOHN PORTLOCK,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joshua John Portlock ("Portlock") to 27 months of incarceration, 36 months of supervised release, $2,000 in restitution, and a special assessment of $100. The government's recommended sentence is at the midpoint of the 24 to 30 months guidelines range, as calculated by the government and the U.S. Probation Office.

## I.    INTRODUCTION

The defendant, Joshua Portlock participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

Portlock, a 42-year-old from Smyrna, Tennessee, traveled with his wife to Washington D.C. to attend the "Stop the Steal" rally held on January 6, 2021. On that day, Portlock joined a crowd that gathered between the Washington Monument and the Ellipse, and then proceeded to the U.S. Capitol. While on Capitol grounds, Portlock repeatedly attempted to breach police lines at both the western front of the U.S. Capitol and the Lower West Terrace tunnel (the "Tunnel"). Specifically, at approximately 2:30 p.m., Portlock grabbed and removed a metal barrier delineating the restricted area and separating a line of officers in the western plaza from the growing mob of rioters. As rioters like Portlock removed the metal barriers, police officers retreated to form a second smaller defensive line. Portlock followed the officers and picked up a large piece of plywood and pushed it into and against a group of officers in this second defensive line. After these actions, at approximately 3:00 p.m., Portlock entered and spent approximately 20 minutes in and around the Tunnel. During his time at the Tunnel, Portlock moved to the front of the rioters, obstructed law enforcement efforts to push back against the rioters, participated in "heave-ho" efforts against police officers, and helped pass stolen police riot shields to the front of the line on at least two occasions. Portlock was easily identified in images and video taken during the January 6 riot due to his distinctive clothing, which included dark boots, jeans, a black jacket, olive green tactical gloves with black knuckle protectors, a red bandana around his neck, and a black beanie

---

Capitol Building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

on his head beneath a white cowboy hat with the words "Trump 2020" on the front and "Stop the Steal" in red letters on the back. Portlock's black beanie, which became visible after his cowboy hat was knocked off during a scuffle with police officers in the Lower West Terrace tunnel, had a yellow wreath emblem on it, a sign of affiliation with the Proud Boys.[2]

The government recommends that the Court sentence Portlock to 27 months of incarceration for his conviction of violating 18 U.S.C. 111(a). A 27-month sentence reflects the gravity of Portlock's conduct.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 46, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.  Portlock's Role in the January 6, 2021 Attack on the Capitol

Portlock traveled to Washington, D.C. with his wife to attend the "Stop the Steal" rally on January 6, 2021. Initially, Portlock was at the "Stop the Steal" rally and part of a crowd gathered between the area of the Washington Monument and the Ellipse. Following the Rally, Portlock walked from the Ellipse to the West Front of the U.S. Capitol, near the north scaffolding on the

---

[2] Proud Boys is a nationalist organization with multiple US chapters and potential activity in other Western countries. The group describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." See *U.S. v. Bertino*, 22-cr-329-TJK, ECF 5.

west side of the building. There, police officers had installed a row of barricades which demarcated the restricted area the public was not allowed to enter.

***Portlock's actions on the West Front***

At approximately 2:28 p.m., Portlock, along with other rioters, breached the defensive perimeter demarcating the restricted area and pushed police officers back toward the Capitol Building. As shown in Figure 1, screenshots from Exhibit 1, Portlock pushed open a metal barricade while U.S. Capitol Police ("USCP") and Metropolitan Police Department ("MPD") officers stood on the other side and attempted to keep the barricades in place.[3]   After pushing the barricade open, Portlock then grabbed it away from officers and carried it into the crowd, ensuring the police could no longer use it to keep the increasing number of rioters away from the Capitol.



*Figure 1*

Portlock's actions were also captured on MPD Body Worn Camera ("BWC") footage. As shown in Figure 2 below, a still shot from Exhibit 2, Portlock violently grabbed and wrenched the metal barricade away from police, before carrying it into the mob of rioters.

---

[3] Exhibit 1 is a clip taken from an open source video which is found at https://www.youtube.com/watch?v=QfEjzABHqeY.



*Figure 2 – Portlock circled in red*

After rioters pushed the barricades and created gaps in the police line, officers fell back and established a second defensive perimeter closer to the Capitol, although this perimeter lacked metal barricades. Following the retreating officers, at approximately 2:31 p.m., Portlock joined with other rioters and assaulted these officers in an apparent effort to break the perimeter and enter the U.S. Capitol. As shown in several video sources, including Exhibit 3, Portlock picked up a large piece of plywood and, with the help of another rioter, pushed the plywood into and against the line of officers.[4] Portlock and other rioters then pushed the piece of plywood over the officers and it landed on top of them. Figures 3 and 4 below show screenshots depicting Portlock's actions. As the officers were occupied with the plywood thrown into them, other rioters attacked them from the side.

---

[4] Exhibit 3 is a clip from https://banned.video/watch?id=5ff73a601669d333f2b27315.

 

*Figure 3*                     *Figure 4 – Portlock circled in red*

USCP Officer D.C. and Sergeant A.G. were later identified as two of the officers assaulted by Portlock when he pushed the plywood into the police line. According to Sergeant A.G., he was struck by the plywood when it fell on him, and the force of the plywood pushed USCP officers back.

After sustaining repeated assaults from Portlock and his fellow rioters, officers were forced to abandon the second defensive line and fell back further toward the Capitol Building. Portlock then moved toward the Tunnel, where some of the most violent confrontations between rioters and officers occurred on January 6.

### *Portlock's actions in the Tunnel*

By approximately 2:46 p.m., Portlock moved from the West Front area to the Tunnel, where he joined other rioters attempting to push through the police line and into the U.S. Capitol. Overall, Portlock was in the Tunnel for approximately 15-20 minutes, during which time he assaulted and obstructed officers, including by participating in "heave-ho" pushes against officers,

which involved multiple rioters collectively leaning back then pushing forward against officers, while chanting "heave-ho" to coordinate their efforts. Additionally, on at least two occasions, Portlock passed stolen USCP riot shields to the front line of rioters, which assisted those rioters in their assaults on officers. As with his actions on the West Front, Portlock's conduct at the Tunnel was captured by multiple video sources, including video from participants and observers, MPD BWC, and USCP Closed Circuit Television ("CCTV").

Examining Portlock's actions more closely, as he entered the Tunnel, video captured by a member of the press shows Portlock moving to the front of the line of rioters, where he confronted USCP and MPD officers.[5]   Portlock can be seen wearing his black jacket, red bandana, and white cowboy hat with "Stop the Steal" printed in red letters on the rear of it. As Portlock advanced to the front of the line of rioters, he helped fellow rioters brace themselves, presumably to better push against officers. Portlock also passed up a stolen USCP riot shield to rioters at the front of the line, as shown below in Figures 5 and 6, still shots from Exhibit 4.

 

*Figure 5- Portlock circled in red*        *Figure 6 - Portlock circled in red*

---

[5] Exhibit 4 is a clip taken from https://www.youtube.com/watch?v=cJOgGsC0G9U (the "Status Coup video")

As he reached the front of the mob, Portlock appeared to engage in a brief scuffle with police officers, during which his cowboy hat was yanked off and thrown back into the group of officers. Under the cowboy hat, Portlock wore a black cap with a yellow wreath insignia on it which, as previously described, is a Proud Boys insignia. Figures 7 and 8 below, show Portlock's hat being removed and the black cap with yellow insignia.

 

*Figure 7 - Portlock circled in red*          *Figure 8 - Portlock circled in red*

As Portlock scuffled with police officers, law enforcement struggled to push rioters back to the first set of doors further away from the Capitol Building. Verbal commands and announcements were made directing the crown to disperse and alarms were blaring. As this struggle ensued, BWC footage from MPD Sergeant W.B. taken just before 3:00 p.m. showed him order Portlock to "Get out! Go! Go now!", but Portlock ignored Sergeant W.B., shrugged, gestured to the crowd, and said "I can't with this!" Still shots from Sergeant W.B.'s BWC depicting these events are shown below in Figures 9 and 10, still shots from Exhibit 5.

 

*Figure 9*                              *Figure 10*

After ignoring Sergeant W.B.'s order, Portlock remained at the front of the line of rioters. While Portlock appeared to not actively fight officers at this time, his continued presence obstructed officers and enabled other rioters to assault those officers. For example, at one point, a rioter reached over Portlock and struck Sergeant W.B. with a baton, as depicted in Figure 11, another still shot from Exhibit 5. Rather than push back against the rioter, Portlock simply stood with his hands raised in the air. The baton strike knocked Sergeant W.B.'s chemical spray from his hands, though he was able to recover it.

9



*Figure 11*

As Sergeant W.B. was struck with a baton, another rioter—shown in Figure 11 with a bald head and red checkered shirt—pressed against the doors and experienced a medical emergency. Although this rioter had just been fighting officers, he now asked for their assistance. Portlock— also acknowledging the officers' authority, which he had chosen to ignore to this point—pled with the officers to help the rioter, all while other rioters continued to fight and prevent the officers from closing the first set of doors. Despite the rioters pushing against them, officers managed to assist the rioter seeking assistance.

After MPD Officers finally pushed Portlock and other rioters back and closed the first set of doors, Portlock receded into the back of the mob, but he remained in the Tunnel entrance for several minutes. During that time, Portlock passed four stolen USCP riot shields forward into the

10

Tunnel to assist other rioters, as shown as shown below in Figure 12, a compilation of still shots from Exhibit 6. Based on a review of CCTV footage and open-source video, the shields which Portlock passed forward were then used by the frontline rioters to continue their attacks on the USCP and MPD officers.



*Figure 12- Portlock circled in red*

After passing the shields to the front line of rioters, Portlock then engaged in a coordinated "heave-ho" with other rioters, where he used his body weight to join rioters pushing against

officers, as shown in Figures 13 and 14, additional still shots from Exhibit 6. Portlock remained in the scrum of rioters pushing against USCP and MPD Officers for approximately the next two minutes.



*Figure 13 - Portlock circled in red    Figure 14 - Portlock circled in red*

Portlock then left the Tunnel entrance area and moved back to the Lower West Terrace. Video taken at the Lower West Terrace appears to show Portlock looking to see what happened to officers who were separated from officers and beaten by rioters. First, footage shows MPD Officer M.F. being dragged into the mob and beaten before he was eventually helped back to the line of police officers. Additional footage from another officer's BWC does show Portlock approaching officers at the Tunnel entrance and asking, "Is he good?," likely referring to Officer M.F.

Later, MPD Officer B.M. was pulled into the crowd of rioters. As other rioters assaulted Officer B.M., Portlock grabbed Officer B.M.'s collar, and helped push him into what appears to be a nearby handicap access elevator. By doing so, Portlock effectively kept Officer B.M. away from rioters who sought assault him further.

Portlock was first identified when the FBI received a tip from his former coworker who had seen a photo of Portlock on FBI.GOV. Following the initial identification, the FBI compared Portlock's driver's license, social media photos, and photos taken during surveillance with images and videos from January 6.   Portlock's identity was further confirmed by another former coworker during an interview conducted by the FBI. Additionally, when arrested, Portlock was also identified by his 18-year-old son. At the time of his arrest, Portlock declined to be interviewed by the FBI.

### III.    THE CHARGES AND PLEA AGREEMENT

On March 4, 2022, a federal grand jury returned an indictment charging Portlock with eight counts, including, Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1). On, August 31, 2023, Portlock was convicted of this offense based on a guilty plea entered pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Portlock now faces sentencing on one count of Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, $2,000 in restitution, and a mandatory special assessment of $100. PSR ¶ 5.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the Presentence Report ("PSR") calculations of the Sentencing Guidelines. According to the PSR, Portlock's offense level under the Sentencing Guidelines is as follows:

Count Four: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **17** |

*See* Plea Agreement at ¶ 5.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 8. Accordingly, the U.S. Probation Office calculated Portlock's Guidelines imprisonment range at 24 to 30 months' imprisonment. PSR ¶ 93 The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because Portlock directly "use[d] violence [and made] credible threats of

violence." U.S.S.G. § 4C1.1(a)(3). Specifically, Portlock: (1) pulled a bike rack barrier away from an officer on the West Front, which allowed other rioters to rush officers defending the police line and forced them to retreat in fear; (2) picked up a large piece of plywood and pushed/threw it into a line of officers, injuring MPD Officers D.C. and Sergeant A.G.; (3) moved to the front of the line of rioters in the Tunnel, where he pushed against officers and stole riot shields which the officers were using to defend themselves, further endangering those officers; (4) ignored commands and obstructed officers in the Tunnel—all with a smirk on his face shown in Figure 11—which led to Officer W.B. being hit with a baton; (5) engaged in the heave-ho against officers in the Tunnel, one of the most violent locations at the Capitol on January 6; and (6) passed additional stolen riot shields to other rioters, which they used to assault officers. All of these are independent reasons why 4C1.1 does not apply to Portlock. The government is aware of at least two cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence, *United States v. Gundersen*, 21-cr-137 (RC) and *United States v. Baquero*, 21-cr-702 (JEB).

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). The Section 3553(a) factors, discussed next, weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Portlock's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Portlock was part of a crowd that pushed and removed metal

barriers supporting a line of law enforcement officers in the western plaza. After police then retreated to form a smaller defensive line, Portlock picked up a large piece of plywood and pushed it against a group of officers, striking at least two USCP officers in the process. Portlock then spent approximately 20 minutes in and around the Tunnel, during which time he participated in "heave-ho" efforts against law enforcement, ignored their orders, and helped pass multiple stolen police riot shields to the front of the mob which rioters then used to assault officers.

The actions undertaken by Portlock occurred at pivotal times and locations which saw some of the most vicious fighting on January 6. Accordingly, the nature and circumstances of Portlock's offenses were of the utmost seriousness and support the government's recommended sentence of 27 months' incarceration.

**B.  The History and Characteristics of the Defendant**

Portlock is currently unemployed but has past experience in a number of jobs. PSR ¶¶ 78-84. Amongst his other past jobs, while Portlock did briefly serve in the United States Army between 1999 and 2000, he. did not deploy overseas; was arrested for purchasing ecstasy from another servicemember; and was separated from the Army with a general discharge, not an honorable discharge. PSR ¶¶ 47, 85. But even though Portlock's service was short and undistinguished, he still swore an oath to support and defend the Constitution, and his actions on January 6 were a total betrayal of that oath.

It is also worth noting that although the defendant would not discuss with the Probation officer his affiliations with any groups, Portlock wore a Proud Boys cap on January 6. Moreover, the investigation into Portlock revealed that he attended Proud Boys rallies in the past.

16

Overall, Portlock's conduct on January 6 was appalling and the epitome of disrespect for the law, law enforcement officers, and our constitutional process. While Portlock did inquire about one officer's safety and seemed to push another officer away from other rioters, he still engaged in terrible and violent actions that day, which included assaulting other officers. Portlock was not a passive participant in the riot and he should have known better. Accordingly, a period of incarceration at the middle-of-the-guideline-range is appropriate.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Portlock's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. In particular, there is a need to deter Portlock from ever again participating in a riot like the January 6, 2021 attack on the Capitol.

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

17

While Portlock pled guilty to violating 18 U.S.C. § 111(a)(1), he has not expressed any remorse for his crime. He knowingly and intentionally: pulled a barricade away from a police officer at the West Front, allowing rioters to enter the restricted area and forcing officers to flee; picked up and pushed a large piece of plywood into two officers and helped rioters overcome the second police perimeter on the West Front; went into the Tunnel, worked his way to the front of the rioters, and despite being told to leave, stood there and refused with a smirk on his face, while another rioter hit Officer W.B. with a baton; engaged in the "heave-ho" at the Tunnel against officers; and passed stolen riot shields to other rioters, who then used them to assault officers. While Portlock may have pled guilty, his actions on January 6 and lack of remorse for them demonstrate the need for a sentence of incarceration.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

18

**F.      Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of

the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[8]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Thompson*, 21-cr-461-RCL, the defendant pled guilty to assault of a federal officer with a deadly or dangerous weapon, in violation of 18 U.S.C. § 111(b), pursuant to a plea agreement. Like Portlock, Thompson physically engaged with officers in the tunnel, in that case by throwing objects at officers and hitting one on the hand with a metal baton. Similar to Portlock, Thompson's assault on its own was relatively short-lived, but overall was part of a prolonged, brutal attack on the officers in the Lower West Terrace tunnel. While Portlock did not use a baton to fight with police in the Tunnel, he did physically engage with officers while there, participated in the "heave ho" efforts against officers, and passed stolen riot shields through the crowd of rioters, all in addition to picking up and pushing a large sheet of plywood into two officers. While Thompson's guidelines range of 46 to 57 months was higher than Portlock's because he was convicted of violating 18 U.S.C. § 111(b), and Thompson received a low end of the range sentence of 46 months, Thompson substantially differed from Portlock in one important respect when it comes to sentencing: Thompson showed extraordinary acceptance of responsibility by turning himself in to law enforcement, cooperating with the government by providing information at multiple debrief meetings, in addition to pleading guilty. Portlock has not shown such remorse, and accordingly deserves a sentence in the middle of his guidelines range.

In *United States v. Galetto,* 21-cr-517-CKK, the defendant pled guilty to assault of a federal officer with a deadly or dangerous weapon, in violation of 18 U.S.C. § 111(a), as well as Civil Disorder, in violation of 18 U.S.C. §231, pursuant to a plea agreement. Following the "Stop the

Steal" rally, Galetto went to the West Front of the United States Capitol, arriving between 2:00 p.m. and 2:40 p.m. When rioters overran the police line in the West Plaza at 2:28 p.m., police officers who had been holding the line retreated to the Lower West Tunnel. At 2:40 p.m., Galetto was one of the first rioters to enter and advance against the police line inside the Tunnel. Galetto pushed against one of the officers and tried to take his riot shield. Galetto left the tunnel and then re-entered it around 4:15 p.m. and was part of one of the last pushes against officers who were attempting to hold the Tunnel. Jude Kollar-Kotelly sentenced Galetto to 27 months of incarceration.  Like Galetto, Portlock was a key agitator at one of the most violent locations at the Capitol on January 6, and therefore Portlock deserves a similar sentence.

In light of these other similar cases and for all of these reasons a sentence of 27 month's incarceration is appropriate for the actions taken by Portlock on January 6.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[9] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[9]  The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer xxx, did not suffer bodily injury as a direct result of Portlock's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Portlock must pay $2,000 in restitution, which reflects in part the role Portlock played in the riot on January 6.[10]   Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Portlock's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 114.

---

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months of incarceration, 36 months of supervised release, $2,000 in restitution, and a special assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    /s/ *Elizabeth N. Eriksen*
Elizabeth N. Eriksen
VA Bar No. 72399
Trial Attorney, Detailee
601 D Street, N.W.
Washington, D.C. 20001
(202) 616-4385
Elizabeth.Eriksen2@usdoj.gov